UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ANNIE WILLIAMS, as next friend of LJAWUAN FOBBS,<br><br>        Plaintiff,<br><br>        v.<br><br>MICHAEL J. ASTRUE,[1]<br>Commissioner,<br>Social Security Administration<br><br>        Defendant. | Civil Action No. 06-1498 (RMC) |

## MEMORANDUM OPINION

Ljawuan Fobbs[2] was diagnosed as meeting the criteria for Attention-Deficit/Hyperactivity Disorder ("ADHD") by the Department of Psychiatry/Psychology at Children's Hospital, Washington, D.C., in April 2004, when he was seven years old and in the first grade. Since that time, he has received medications for the disorder and has shown improvement despite a severe impairment. The question brought to the Court is whether the decision of the Commissioner of the Social Security Administration ("Commissioner") to deny supplemental security income ("SSI") benefits to Ljawuan Fobbs is supported by substantial evidence. Finding that it is, the Court will affirm the decision of the Commissioner and deny Ms. Williams' ("Plaintiff's") motion for judgment

---

[1] Michael J. Astrue is substituted for his predecessor as Commissioner, Social Security Administration, pursuant to Fed. R. Civ. P. 25(d).

[2] The Court notes that school records reflect the claimant's name as "L'Jawaun." *See* Administrative Record Transcript ("A.R.") 123. Children's Hospital records reflect his name as "Ljawaun." A.R. 115. The court docket indicates that Ms. Williams' first name is Annie but the transcript of the hearing below indicates that it is Amy. A.R. 149. This Memorandum Opinion uses the names and spellings on the court docket.

of reversal.

## I. BACKGROUND

### A. Medical Evidence

Ljawuan was seen at the Department of Psychiatry/Psychology at Children's Hospital on April 1, 2004. A.R. 115. At 7 years old, he had a rapid speech pattern and ran out of the house when angry; was impulsive and interruptive; was inattentive, with difficulty at school and home; fought in school; threw temper tantrums, destroyed toys belonging to others, and hit his sisters. *Id*. He would run into the street and chase cars, causing much anxiety for his mother. *Id*. Ljawuan had experienced anxiety going to the blackboard in school, had unsatisfactory grades, had repeated kindergarten, and was at risk of repeating first grade. *Id*. He had also stolen a gun from a store in the prior year. *Id*. He had poor eye contact and he mumbled. A.R. 117.

At his appointment on April 1, 2004, Ljawuan was dressed appropriately, had good hygiene, and was cooperative. *Id*. His affect was appropriate and his mood was happy, but he was easily distracted. *Id*. When interviewed by the doctor, he was restless and fidgety. *Id*. He had fair insight, judgment, and intelligence. *Id*. He reported that he was sometimes sad when he thought about his sister's boyfriend, who had been killed. A.R. 116-17. He also reported that he had nightmares about bats and the devil, feared falling and dying, and feared that he would be shot. A.R. 117. He was assessed as meeting the criteria for ADHD, combined type, was started on Adderall, and his mother was directed to request an Individual Education Plan ("IEP")[3] at school. A.R. 118-

---

[3] An IEP is a written statement that includes goals and instructional objectives for the student's education, services to be provided, projections regarding the dates on which such services are to be offered, and criteria for evaluating whether instructional objectives are met. 20 U.S.C. § 1414(d)(1)(A); *see also* 20 U.S.C. § 1401(14).

19.

Ljawuan returned to Children's Hospital on April 15, 2004, at which time it was noted that his inattention and hyperactivity had improved but that his impulsiveness and grades had not. A.R. 120. He was alert, oriented, and cooperative. *Id*. He continued to have poor eye contact, nightmares, and fears. *Id*. Ms. Williams was advised to get a night light for Ljawuan's bedroom and to obtain a copy of his report card. *Id*. Thereafter, Dr. Jay Salpekar of Children's Hospital wrote a letter dated April 15, 2004, advising Ljawuan's school of his diagnosis and treatment. He stated that Ljawuan's symptoms appeared to have improved with medication and advised that he would benefit from additional help from his teachers and school staff. *Id*. He also recommended an IEP or 504 Plan[4] to provide structure to Ljawuan's day and involve his mother in overseeing homework. *Id*. A Multidisciplinary Team Meeting was held at his elementary school on April 21, 2004, at which time it was determined that a 504 Plan would be developed "to include breaks as needed, extra response time as needed, frequent feedback, monitoring on-task behavior, reminders to use a slower rate in completing work to assist with eliminating/decreas[ing] mistakes, [and] cues for assisting with letter reversals." A.R. 123. Summer school was also suggested. *Id*. Testing for special education services was considered but rejected because of the improvements seen in Ljawaun's progress once he began taking medication for ADHD. *Id*.

In a follow-up visit to Children's Hospital on May 27, 2004, it was noted that the Adderall appeared to be wearing off and Ljawuan's impulsive behavior was returning. A.R. 111.

---

[4] Section 504 of the Rehabilitation Act of 1973, as amended, requires that reasonable accommodations be made to ensure that students with disabilities have access to the same services as students without disabilities. *See* 29 U.S.C. § 794. A special education classification is not a prerequisite to eligibility for a 504 Plan.

The Adderall dosage was increased from 5 to 10 mg. *Id*.

Ms. Williams filed an application for SSI benefits for Ljawuan on May 17, 2004. A "Childhood Disability Evaluation" was completed on Ljawuan on July 27, 2004. A.R. 126. It concluded that he had an "impairment or combination of impairments [that was] severe, but [did] not meet, medically equal, or functionally equal the listings." *Id*.[5] Specifically, Ljawuan was found to have no limitation on the domain evaluations of Acquiring and Using Information, Moving About and Manipulating Objects, and Caring for Yourself. He was found to have "less than marked" limitations on the domain evaluations of Attending and Completing Tasks and Interacting and Relating with Others. A.R. 128, 130. Because SSI benefits based on a disability require either marked limitation in two domains or an extreme limitation in one domain, *see* A.R. 129, Ljawuan was found ineligible for benefits.

A second Childhood Disability Evaluation form was completed on Ljawuan on September 14, 2004, after his mother appealed. This evaluation also concluded that Ljawuan's "impairment or combination of impairments is severe, but does not meet, medically equal, or functionally equal the listings" for SSI benefits. On this occasion, Ljawuan was found to have "less than marked" limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Caring for Yourself. He was found to have "marked" limitations in the domain of Interacting and Relating with Others. He was found to have no limitation in the domains of Moving About and Manipulating Objects and Health and Physical Well-Being. The evaluator

---

[5] *See* 20 C.F.R. § 416.926a. "By 'functionally equal the listings,' we mean that your impairment(s) must be of listing-level severity, i.e., it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain, as explained in this section. *Id*.

commented that Ljawuan was found to be "[m]arked in interacting and relating based on parent report even though not [substantiated] by school/report card." A.R. 138. As a result of this evaluation, the decision was reaffirmed that Ljawuan has a severe limitation that does not meet, equal, or functionally equal the listings.

  **B.** **Evidentiary Hearing**

  On October 7, 2004, Ms. Williams requested a hearing before a Social Security Administration ("SSA") administrative law judge ("ALJ") to consider whether Ljawuan should be granted SSI benefits. That hearing was held on November 1, 2005, before ALJ Guy Arthur. *See* A.R. 140-58.

  Under gentle questioning by ALJ Arthur, Ljawuan testified that he liked school and was doing "great." A.R. 144. He told the ALJ that reading was his favorite subject and had received some "B" grades, although he also admitted to some "Ds." A.R. 145, 147. He stated that he had a best friend named Andre and that he liked playing flag football. A.R. 145. The Redskins were his favorite football team. A.R. 146. Ljawuan reported that he got along with the other students and had no problems in school. A.R. 147. At home, his chore was to take out the trash, which he did, although he had to be reminded. A.R. 146. He also reported that he was taking Adderall, that he was good about taking it, and that it helped him. A.R. 147-48.

  Ms. Williams confirmed much of Ljawuan's testimony: According to Ms. Williams, Ljawuan liked school, received some B grades, and got along with his teachers. A.R. 149. Although summer school was recommended, Ljawuan did not attend because Ms. Williams had to work. A.R. 149-50. He was in regular classes but was given extra time to do his work so he could focus. A.R. 153. He had a 504 Plan as the school determined that Ljawuan was not eligible for an IEP. A.R.

152-53. While Ljawuan had been in one fight at school, from which he received a chipped tooth, it had been determined that he was not at fault because he was defending himself. A.R. 153.

Ms. Williams said that she gave Ljawuan his medicine every morning and that it helped but wore off by the time he got out of school. A.R. 150. She told the ALJ that his dosage of Adderall had been increased to 25 mg. A.R. 150-51. She stated that Ljawuan had an attitude and a bad temper and that he had not seen the doctor for a while because she did not have insurance. A.R. 155. At the time of the hearing, however, he did have an appointment to see a psychiatrist. *Id*. Further, when Ljawuan had run out of medicine, Ms. Williams had taken him to the hospital where he was given medication and received Medicaid coverage. *Id*.

ALJ Arthur issued his Hearing Decision on February 16, 2006. *See* A.R. 14-21. He noted that, under SSA, "a child under the age of 18 is considered 'disabled' for purposes of eligibility for Supplemental Security Income payments if the child has a medically determinable physical or mental impairment (or combination of impairments) that results in 'marked and severe functional limitations.'" A.R. 14. Applying this definition, the ALJ determined that Ljawuan is not disabled. A.R. 15. It is this conclusion that is challenged here. The Court therefore quotes at length from the decision.

> On the basis of the child's and his mother's testimony, the child has improved on medication and is doing well in school. He needs some reminders to complete his chores, but otherwise he does not have significant problems with attention and focus. The child's attorney argued that his ADHD met listing 112.11. That listing requires that there be medically documented findings of marked inattention, marked impulsiveness, and marked hyperactivity. The child was involved in only one fight, and there is no evidence of marked impulsiveness. There are no medical findings of marked inattention, marked impulsiveness, or marked hyperactivity. Dr. Salpekar indicated that the child would benefit from additional help in school, but did not indicate anything more was necessary. Historically, the

> child has been able to be attentive to things of interest to him. He would ride his bike and skateboard for long periods of time and play computer games for hours. This is further evidence of the lack of marked inattention. He is also doing well at school and does not have an[y] significant social problems. The evidence does not support a finding of marked inattention, marked impulsiveness, or marked hyperactivity.
>
> After considering the evidence as a whole including the opinions of state agency medical consultants, school reports, and testimony, the undersigned finds that the child has no limitation in the domains of Moving about and Manipulating Objects and Health, Caring for yourself, and Physical Well-Being. He has less than marked limitation in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Interacting and Relating With Others. That conclusion is consistent with the child's school performance, need for reminders to do chores, and limited conflicts at school.

A.R. 17. The ALJ also considered whether Ljawuan had an impairment that was "functionally equal" to a listed impairment. *Id*. He stated that a "child has a 'marked' limitation in a domain when the impairment(s) interferes seriously with their ability to independently initiate, sustain, or complete activities. . . . A 'marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'" *Id*. In contrast, an "extreme" limitation "interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. . . . [it] is the rating we give to the worst limitations . . . [but] does not necessarily mean a total lack or loss of ability to function." A.R. 17-18. Analyzing each domain separately, the ALJ found that Ljawuan "has less than 'marked' limitations" in the domain of (1) Acquiring and Using Information, (2) Attending and Completing Tasks and (3) Interacting and Relating with Others. A.R. 18-19. He based his conclusions as to the first domain on Dr. Wild's opinion (State Agency physician), Dr. Salperkar's assessment, and Ljawuan's "reasonably good progression in school." A.R. 18. He based his conclusions as to the second domain on Ljawuan's academic progression and state agency consultant opinions. *Id*. On

the third domain, the ALJ wrote:

> The issue in this domain is how well the child initiates and sustains emotional connections with others, develops and uses the community's language, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others.
>
> In this domain, the child has less than "marked" limitations. Dr. Wild opined that the child had marked limitations in this domain based on a parent report even though not substantiated by school/report card. The mother's testimony at the hearing does not support finding of a marked limitation in this domain; therefore, Dr. Wild's opinion based on an unsubstantiated report was not accepted. The child was involved in a fight, but police said he was only defending himself. There is no history of excessively aggressive behavior at school. The child's mother also testified that he is doing well on his medications.

A.R. 19. The ALJ found that Ljawuan has no limitations in the domains of Moving About and Manipulating Objects, Caring for Yourself (Self-care), and Health and Physical Well-Being. A.R. 19-20. He concluded:

> Because the child does not have an "extreme" limitation in one area of functioning or a "marked" limitation in two areas, the child does not functionally equal, singly or in combination, any listed impairment. Because the child does not have an impairment or combination of impairments which meets, medically equals any listing, or functionally equals any listing, the undersigned concludes the child is not "disabled" for purposes of eligibility for Supplemental Security Income payments.

A.R. 20. On March 19, 2006, through counsel, Ljawuan requested review by the Appeals Council of the SSA Office of Hearings and Appeals. The record contains no argument by counsel in support of this request. The Appeals Council denied the request for review on June 27, 2006. A.R. 4, 10. This suit was filed on August 25, 2006.

## II.  LEGAL STANDARD

In reviewing a case under the Social Security Act, the district court must defer to the

decision of the ALJ if it is supported by substantial evidence and in accord with applicable law. 42 U.S.C. § 405(g); *see also Davis v. Shalala*, 862 F. Supp. 1, 4 (D.D.C. 1994). "Substantial evidence" is evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The test "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365-66 (D.C. Cir. 2003). Under the Social Security Act, district courts are empowered to review decisions of the Commissioner, but not to substitute their judgment for that of the Commissioner. *Rossello v. Barnhart*, 473 F. Supp. 2d 72, 74-75 (D.D.C. 2007).

### III. ANALYSIS

The only question before this Court is whether there is substantial evidence to support the determination that Ljawuan did not have a "disability" as defined in § 1614(a)(3)(C) of the SSA.

Counsel for Ljawuan does not contest the findings of the ALJ that Ljawuan's impairment(s) did not meet, medically equal, or functionally equal the listed criteria. Instead, he argues that the ALJ had a responsibility to develop a more complete record before reaching any conclusions. The additional information he suggests should have been obtained includes: 1) records from Ljawuan's schools or teachers for the 22 months before the date of decision; 2) records of Ljawuan's "medical or psychological condition" for the 21 months before the decision; 3) records relating to Ljawuan's increased dosage of Adderall; and/or 4) a consultative examination. Memorandum In Support of Plaintiff's Motion for Judgment of Reversal ("Pl.'s Mem.") at 4-5.

There are some fundamental weaknesses to these arguments. First, counsel offers no hint as to what additional relevant information might have been obtained that would have changed the outcome of the ALJ's analysis. Second, all of this information (except the consultative exam)

was more readily available to Ljawuan than to the SSA, but counsel references none of it; such a spectacular silence suggests that the school and/or medical records would not have led to a different result.[6] Third, Ms. Williams certainly knew of Ljawuan's school records and achievements, his medical condition and history, and the increase of his Adderall dosage. She testified about each and all of those subjects at the hearing. Fourth, Ljawuan and his mother were represented by counsel at the hearing; counsel asked questions and was allowed to draw out any information he wanted, including the following exchange:

> Q. Is there anything at all about his disability or his interaction with anybody in the school that you haven't told the Judge that you [want to] tell him?
>
> A. It's mostly his attitude. I think it's more like – he's not, he's smart, but he just flick off real easily, you know. The least little thing, you know, he just have a bad temper.

A.R. 154-55. Ms. Williams also testified that Ljawuan had not seen the psychiatrist in months because she did not have insurance, although the doctor wanted to see Ljawuan every month. *Id.* at 155.

Having reviewed the pleadings and the record, and for the additional reasons stated below, the Court finds that the decision of the ALJ is supported by substantial evidence and in accord with applicable law.

    **A.**    **ALJ Properly Followed the 3-Step Process of Review Pursuant to the SSA**

An ALJ's decision regarding disability benefits under the Social Security Act

---

[6] There were many points in time when Ms. Williams could have submitted additional evidence but did not. *See, e.g.*, A.R. 12 ("You should submit any new evidence you wish to the Appeals Council to consider with your request for review); A.R. 24 ("If there is more evidence you want to submit, get it to [the ALJ] right away. If you cannot get the evidence to me before the hearing, bring it to the hearing.").

proceeds according to three steps. 20 C.F.R. § 416.924; *see also Rice v. Massanari*, 01-1349, 2002 U.S. Dist. LEXIS 15250, at *4-6 (D.D.C. August 16, 2002). First, an ALJ must assess whether a claimant is engaged in "substantial gainful activity." Second, an ALJ must determine if the alleged impairments are severe, either separately or in combination. Finally, if the ALJ determines that a claimant has severe impairments, the ALJ must evaluate whether the alleged impairment(s) meet or medically equal the criteria for a disability listing, or if a claimant's impairment(s) are the functional equivalent of any listed impairments pursuant to 20 C.F.R. § 416.926a. This third step requires an assessment of a claimant's limitations in six broad areas of functioning called "domains" which are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). A listing level of severity is met where a claimant has "marked" limitations in two of the domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d).

In this case, the ALJ followed the sequential steps for evaluating disability for children under the age of 18 as set forth in 20 C.F.R. § 416.924. *See* A.R. 14-21. At step one, the ALJ found that Ljawuan had not engaged in substantial gainful activity. A.R. 20. At step two, the ALJ considered the evidence and determined that Ljawuan has ADHD, an impairment that is severe within the meaning of the regulations. A.R. 15, 20. At step three, the ALJ considered Ljawuan's impairment under listings and the factors outlined in 20 C.F.R. § 416.924a. A.R. 16-20. The ALJ concluded that Ljawuan's impairments did not meet, medically equal, or functionally equal the criteria of any of the listed impairments. A.R. 17, 20-21. 20 C.F.R. § 416.924(d). Accordingly, the ALJ found that Ljawuan was not disabled as defined in the Social Security Act as a child. A.R. 20-

21.

  **B. Substantial Evidence Supports the ALJ's Decision**

    1. <u>Medical and School Records</u>

  In general, a claimant must prove that he or she is disabled by furnishing medical and other evidence that may be used to reach conclusions about the claimant's medical impairments and the effect of such impairments upon the claimant's ability to learn and progress with education and, ultimately, work. *See* 20 C.F.R. § 416.912; *Reichenbach v. Heckler*, 808 F.2d 309, 311 (4th Cir. 1985) (burden is on claimant to establish *prima facie* case of disability). The burden is on the claimant because s/he is in a better position to provide the information about a relevant medical condition. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). Not only has Plaintiff failed to meet this burden, Plaintiff overlooks the fact that the ALJ did probe into, inquire of, and explore relevant facts regarding Ljawuan's condition, including any effects upon his education. *See Walker v. Harris*, 642 F.2d 712, 713 (4th Cir. 1981). Upon inquiry, Ljawuan informed the ALJ that he liked school and was doing great. A.R. 144. He testified that his favorite subject was reading, that he had "Bs," and admitted that he also had some "Ds." A.R. 145, 147. Ljawuan further testified that he had no problems in school and got along with the other students. A.R. 147. He informed the ALJ that he had a best friend, that he liked to play flag football, and that he was required to take out the trash. A.R. 146. He also admitted that he had to be reminded to take out the trash, but that once he was reminded, he did as he was asked. *Id*. Ljawuan told the ALJ that he took Adderall, that he was good about taking his medication, and that the medication helped him. A.R. 147-48.

  Ms. Williams' testimony at the hearing confirmed much of Ljawuan's testimony. She stated that Ljawuan liked school, had some "Bs," and got along with his teachers. A.R. 149.

According to Ms. Williams, summer school was only to assure that Ljawuan would remain focused and retain what he had learned during the school year. A.R. 150.[7] Ms. Williams further testified that Ljawuan was not in special education classes and was not eligible for an IEP. A.R. 152-53. Rather, she stated that Ljawuan had a 504 Plan which gave him "extra time to do his work so he can focus."[8] Ms. Williams said that Ljawuan's Adderall dosage had been increased, but also confirmed that the medication helped Ljawuan. A.R. 150-51. According to Ms. Williams, Ljawuan had been absolved of any wrongdoing in a school altercation. A.R. 153. In response to questions, Ms. Williams stated that Ljawuan had not been to a doctor for a period of time due to a lack of insurance. A.R. 155. He did, however, have an appointment scheduled. *Id*.

Based upon Ljawuan's testimony and that of his mother, the ALJ concluded that Ljawuan had improved on his medication, was doing well in school, and did not have significant problems with attention and focus, other than the need for reminders to complete his chores. A.R. 17. The ALJ found that Ljawuan had less than marked limitations in acquiring and using information, in attending and completing tasks, and in interacting and relating with others, with no limitations in moving about and manipulating objects or in self-care. A.R. 18-19. The ALJ's conclusions are supported by the testimony of Ljawuan and his mother on these issues, *see* A.R. 144-45, 147, 149, 152-53, and by other record evidence. *See, e.g.*, A.R. 121 (School Progress Report).

The ALJ met his duty to explore the facts and issues necessary for the adequate

---

[7] This testimony comports with evidence in the record that advises that summer school was only suggested and not required. *See* A.R. 123 ("The [Multidisciplinary Team suggested summer school for [Ljawuan].").

[8] This testimony confirms that the actual 504 Plan is in line with what was recommenced in April 2004. *See* A.R. 123 (504 Plan was to include breaks and extra response time as needed).

development of the record. He is not expected to acquire further information when, *inter alia*, both Ljawuan and his mother testified that he was doing well in school and he was on medication that appeared to control his condition even if it was a higher dosage than indicated previously in the paperwork. In light of the foregoing, there is nothing to suggest that additional medical/educational records or a consultative examination could or would have adduced evidence that might have altered conclusions of the ALJ.

### 2. Consultative Examination

Despite the evidence of significant improvement provided by his own testimony and that of his mother, Ms. Williams contends that the ALJ was required to have ordered a consultative examination. *See* Pl.'s Mem. at 5 ("[b]y failing to order a consultative examination, as mandated by the Regulations, the [ALJ] has failed in his duty to develop the administrative record"), citing 20 C.F.R. § 404.1512(f) ("If the information we need is not readily available from the records of your medical treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense."). Ms. Williams offers no explanation or evidence that a consultative examination would enhance the existing record. An ALJ is not obligated to order a consultative examination when there is sufficient evidence to make a fair assessment of a claimant's impairments. *See France v. Apfel*, 87 F. Supp. 2d 484, 490 (D. Md. 2000) ("the ALJ does not otherwise have an obligation to obtain additional information if the record is adequate to make a determination regarding a disability claim").

### IV. CONCLUSION

For the reasons stated above, Ms. Williams' motion for judgment of reversal [Dkt. # 4] will be denied, the Commissioner's motion for judgment of affirmance [Dkt. # 7] will be

granted, and this case will be dismissed. A memorializing order accompanies this Memorandum Opinion.

Date: December 7, 2007                             /s/
                                    ROSEMARY M. COLLYER
                                    United States District Judge